IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-162

No. 368A20

Filed 17 December 2021

REYNOLDS AMERICAN INC.

v.

THIRD MOTION EQUITIES MASTER FUND LTD, MAGNETAR CAPITAL MASTER FUND, LTD., SPECTRUM OPPORTUNITIES MASTER FUND LTD, MAGNETAR FUNDAMENTAL STRATEGIES MASTER FUNDS LTD, MAGNETAR MSW MASTER FUND LTD, MASON CAPITAL MASTER FUND, L.P., BLUE MOUNTAIN CREDIT ALTERNATIVES MASTER FUND L.P., BLUEMOUNTAIN FOINAVEN MASTER FUND L.P., BLUEMOUNTAIN GUADALUPE PEAK FUND L.P., BLUEMOUNTAIN SUMMIT TRADING L.P., BLUEMOUNTAIN MONTENVERS MASTER FUND SCA SICAV-SIF, and BARRY W. BLANK TRUST, defendant-appellants

and

ANTON S. KAWALSKY, trustee for the benefit of Anton S. Kawalsky Trust UA 9/17/2015, CANYON BLUE CREDIT INVESTMENT FUND L.P., THE CANYON VALUE REALIZATION MASTER FUND, L.P., CANYON VALUE REALIZATION FUND, L.P., AMUNDI ABSOLUTE RETURN CANYON FUND P.L.C., CANYON-SL VALUE FUND, L.P., PERMAL CANYON IO LTD., CANYON VALUE REALIZATION MAC 18 LTD., defendant-appellees

Appeal pursuant to N.C.G.S. § 7A-27(a)(2) from a final judgment entered on 27 April 2020 by Chief Business Court Judge Louis A. Bledsoe III in Superior Court, Forsyth County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(b). Heard in the Supreme Court on 31 August 2021.

*Donald H. Tucker Jr., Christopher B. Capel, Clifton L. Brinson, and Gary A. Bornstein, pro hac vice, for plaintiff-appellee Reynolds American Inc.*

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP, by Jessica Thaller-Moran and Jennifer K. Van Zant; and Rolnick Kramer Sadighi LLP, by Lawrence M. Rolnick, pro hac vice, Sheila A. Sadighi, pro hac vice, and Jennifer A. Randolph, pro hac vice, for defendant-appellants Mason Capital Master Fund, L.P., Blue Mountain Credit Alternatives Master Fund L.P., BlueMountain Foinaven Master Fund L.P., BlueMountain Guadalupe Peak Fund L.P., BlueMountain Summit Trading L.P., and BlueMountain Montenvers Master Fund SCA SICAV-SIF.*

*George F. Sanderson III, Kevin G. Abrams, and J. Peter Shindel Jr. for defendant-appellants Third Motion Equities Master Fund Ltd, Magnetar Capital Master Fund, Ltd, Spectrum Opportunities Master Fund Ltd, Magnetar Fundamental Strategies Master Fund Ltd, and Magnetar MSW Master Fund Ltd.*

*Kieran J. Shanahan, Brandon S. Neuman, and Christopher S. Battles for defendant-appellant Barry W. Blank Trust.*

*No brief for defendant-appellees.*

EARLS, Justice.

¶ 1        This case requires us to interpret and apply N.C.G.S. §§ 55-13-01 et seq. to decide whether the Business Court properly determined the "fair value" of shares held by shareholders in a tobacco company, Reynolds American Inc. (RAI), who sought judicial appraisal after RAI was acquired by the international tobacco conglomerate British American Tobacco (BAT). The Business Court determined that the $59.64 per share plus interest RAI paid these shareholders (the dissenters) after they notified RAI of their intent to seek judicial appraisal "equals or exceeds the fair value of RAI shares as of the date of the Merger and that RAI is therefore entitled to

a judgment that no further payments to [the dissenters] are required." *Reynolds Am. Inc. v. Third Motion Equities Master Fund Ltd.*, 2020 NCBC 35, 2020 WL 2029621 (N.C. Super. Ct. 2020). On appeal, the dissenters challenge the Business Court's judgment on various grounds. For the most part, the dissenters' challenges relate to their central assertion that the Business Court failed to determine the fair value of their shares using "customary and current valuation concepts and techniques" as required under N.C.G.S. § 55-13-01(5). Instead, in the dissenters' view, the Business Court "simply deferred to the value of the merger consideration negotiated by BAT in January 2017 and concluded it was a 'fair price.' "

¶ 2          The dissenters' characterization of the analysis performed by the Business Court is inconsistent with any fair reading of the challenged judgment. Rather than "defer[ ] entirely to the deal price struck with an insider in the transaction at issue," the Business Court appropriately considered the deal price as one indicator of the fair value of the dissenters' shares after finding that given the circumstances of this particular transaction, the deal price reliably reflected fair value. In addition, the Business Court properly utilized numerous other "customary and current valuation concepts and techniques" in order to determine the fair value of the dissenters' shares. The dissenters' other challenges to the Business Court's judgment are also without merit. Accordingly, we affirm.

## I.    The merger and North Carolina's appraisal statutes

¶ 3        On 16 January 2017, BAT entered into an agreement to purchase North Carolina-based RAI. Prior to the agreement, BAT owned approximately 42% of RAI's shares and controlled several seats on its Board of Directors. However, the merger agreement was negotiated by BAT and a "Transaction Committee" comprised of non-BAT-affiliated RAI board members. The merger consideration included 0.5260 shares of BAT plus $29.44 in cash. On the date of the merger agreement, this consideration was worth $59.64 per RAI share. The transaction ultimately closed on 25 July 2017. On this date, the merger consideration was worth $65.87 per RAI share. The transaction was "overwhelmingly approved" by a majority of RAI's outstanding shares, including ninety-nine percent of the non-BAT-owned shares which were voted in the merger. *Reynolds Am. Inc.*, 2020 WL 2029621, at *34. This transaction is at the heart of the present case.

¶ 4        In North Carolina, an individual or entity owning shares in a corporation is entitled to seek judicial appraisal to determine the fair value of their shares after certain corporate actions. N.C.G.S. § 55-13-02 (2019). To initiate the appraisal process, a shareholder must (1) "[d]eliver to the corporation, before the vote [on the transaction] is taken, written notice of the shareholder's intent to demand payment if the proposed action is effectuated"; and (2) "[n]ot vote, or cause or permit to be voted, any shares of any class or series in favor of the proposed action." N.C.G.S. § 55-13-21(a)(1)–(2) (2019). Next, the corporation "must deliver a written appraisal notice

and form . . . to all shareholders who" meet these requirements. N.C.G.S. § 55-13-22(a) (2019). Provided that the shareholder does not "vote for or consent to the transaction," N.C.G.S. § 55-13-22(b)(1) (2019), the corporation is then obligated to pay the shareholder "the amount the corporation estimates to be the fair value of their shares, plus interest," N.C.G.S. § 55-13-25(a) (2019). A shareholder who believes the corporation has not paid fair value must notify the corporation, at which point the corporation must either accede to the shareholder's estimate of fair value or file a complaint against the shareholder to initiate an appraisal proceeding within sixty days. N.C.G.S. §§ 55-13-28(a), 55-13-30(a) (2019).

During an appraisal proceeding, the trial court is tasked with determining the "fair value" of the dissenting shareholder's shares. N.C.G.S. § 55-13-01(5) (2019). Subsection 55-13-01(5) defines "fair value" as

> [t]he value of the corporation's shares (i) immediately before the effectuation of the corporate action as to which the shareholder asserts appraisal rights, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable, (ii) using customary and current valuation concepts and techniques generally employed for similar business in the context of the transaction requiring appraisal, and (iii) without discounting for lack of marketability or minority status except, if appropriate, for amendments to the articles pursuant to [N.C.]G.S. 55-13-02(a)(5).

*Id*. In this case, after BAT acquired RAI, a group of dissenting shareholders who believed that the agreed-upon deal price significantly undervalued RAI refused to

tender their shares at closing. They sent RAI a signed appraisal form in September 2017. Subsequently, RAI paid the dissenters "the amount the corporation estimates to be the fair value of their shares," $59.64, "plus interest." N.C.G.S. §§ 55-13-22, 55-13-25(a). The dissenters refused to accept this offer and conveyed their belief that the fair value of their shares was between $81.21 and $94.33 per share.

¶ 6 On 29 November 2017, RAI filed a complaint for judicial appraisal pursuant to N.C.G.S. § 55-13-30. After a lengthy trial, post-trial briefing, and post-trial oral argument, the Business Court entered a judgment containing voluminous findings of fact in support of its conclusion that "the fair value of RAI stock as of the Transaction Date was no more than the deal price of $59.64 per share" and establishing that "[n]o further sums are due from RAI to [the dissenters] for payment of [the dissenters'] shares." *Reynolds Am. Inc.*, 2020 WL 2029621, at *71–72. The dissenters appealed directly to this Court pursuant to N.C.G.S. § 7A-27(a).

¶ 7 This Court has not previously considered an appeal from a Business Court judgment determining the fair value of a dissenting shareholder's shares pursuant to N.C.G.S. §§ 55-13-01 et seq. However, many of the issues raised by the parties have been thoroughly litigated in other jurisdictions, especially in Delaware. Both parties cite extensively to Delaware law in their arguments to this Court, as did the Business Court in its judgment. North Carolina's appraisal statutes do not exactly mirror Delaware's statutes, and regardless, cases decided in a sister jurisdiction are not

binding on this Court. *See, e.g.*, *Wachovia Bank & Tr. Co. v. S. Ry. Co.*, 209 N.C. 304, 308 (1936) ("[D]ecisions of other jurisdictions are persuasive, but not binding on us.") Still, given the well-developed body of law arising from the numerous appraisal cases decided in Delaware, we borrow freely from these cases to the extent we find their reasoning to be persuasive and applicable to the facts here. *See, e.g.*, *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 613 (2018) (relying on Delaware caselaw to resolve a legal issue arising in a shareholder suit).

## II.    Standard of review

North Carolina's appraisal statutes vest the Business Court with significant discretion to decide how best to determine the fair value of a corporation's shares given the circumstances of a challenged transaction. The General Assembly chose not to prescribe any specific methodology the court must utilize in an appraisal proceeding. Rather, the General Assembly has provided only that a court must determine fair value "using customary and current valuation concepts and techniques generally employed for similar business[es] in the context of the transaction requiring appraisal." N.C.G.S. § 55-13-01(5). By implication, it is left to the Business Court in the first instance to determine which valuation concepts and techniques should be utilized to ascertain the fair value of a dissenting shareholder's shares and the weight to accord the results of any particular concept or technique it selects. We therefore review the Business Court's choice to utilize or disregard a proposed valuation

concept or technique, and its decision to accord a selected concept or technique substantial or limited probative weight, solely for abuse of discretion.

¶ 9    In other respects, our standard of review is identical to the standard of review we utilize in considering an appeal from any judgement entered after a non-jury trial.[1] "When the trial court conducts a trial without a jury, the trial court's findings of fact have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them, even though the evidence could be viewed as supporting a different finding." *In re Skinner*, 370 N.C. 126, 139 (2017) (cleaned up). A trial court's unchallenged findings of fact are "presumed to be supported by competent evidence and [are] binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97 (1991). "Findings not supported by competent evidence are not conclusive and will be set aside on appeal." *Penland v. Bird Coal Co.*, 246 N.C. 26, 30 (1957). By contrast, "[c]onclusions of law drawn by the trial court from its findings of fact are reviewable *de novo* on appeal." *Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 517 (2004).

¶ 10    We proceed by examining the dissenters' claims in three ways. First, to the extent the dissenters argue that the Business Court should have utilized a method

---

[1] Notably, both parties agree that the standard of review this Court utilizes when addressing appeals of judgments entered after a bench trial in other, non-appraisal contexts should be utilized here. Neither party proposes that a different standard of review should apply when reviewing a Business Court judgment determining the fair value of a corporation's shares.

for determining fair value it did not rely upon or vice versa, or that the Business Court accorded too much or too little weight to the results of any particular analysis presented at trial, we review for abuse of discretion. We will not disturb the Business Court's judgment unless the dissenters "show[ ] that its [decision] was manifestly unsupported by reason and could not have been the result of a reasoned decision." *State v. McGrady*, 368 N.C. 880, 893 (2016) (quoting *State v. Riddick*, 315 N.C. 749, 756 (1986)); *see also White v. White,* 312 N.C. 770, 777 (1985) ("A ruling committed to a trial court's discretion is to be accorded great deference . . . ."). Second, to the extent the dissenters dispute the Business Court's factual findings, we review those findings to determine if they are supported by substantial evidence.[2] Any findings supported by substantial evidence are binding, even if there is contrary evidence in the record. *See N.C. Farm Bureau Mut. Ins. Co. v. Cully's Motorcross Park, Inc.*, 366 N.C. 505, 512 (2013). Third, to the extent the dissenters argue that the Business Court either failed to adhere to the requirements of North Carolina's appraisal statute or otherwise misapplied relevant law in valuing the dissenters' shares, we review de novo.

---

[2] The dissenters do not expressly state they are challenging any specific findings of fact entered by the Business Court. However, many of the arguments they advance do encompass challenges to findings of fact addressing the utilization of or weight given to valuation concepts or techniques entered by the Business Court in support of its ultimate determination of the fair value of the dissenters' shares.

### III.    The dissenters' challenges to the Business Court's fair value determination

As the Supreme Court of Delaware has explained, "[i]n a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions." *Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3, 17 (Del. 2020) (quoting *M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999)). Thus, in an appraisal proceeding, each side presents evidence to support their contention as to what represents the fair value of the dissenting shareholders' shares, and the Business Court determines the fair value of the shares on the basis of the evidence presented.

On appeal in this case, the dissenters' central claim is that the Business Court did not determine the fair value of their shares "using customary and current valuation concepts and techniques." N.C.G.S. § 55-13-01(5). Instead, the dissenters repeatedly assert that the Business Court ignored this statutory requirement and instead "simply defer[ed] to [the] deal price negotiated by" BAT and RAI. In the alternative, the dissenters contend that even if it may generally be permissible to consider the deal price in an appraisal proceeding, the Business Court erred in utilizing the deal price in this case because the deal was executed without "a robust market check."

**A. The Business Court determined the fair value of the dissenters' shares in accordance with the requirements of N.C.G.S. § 55-13-01(5).**

¶ 13   The dissenters' argument that the Business Court deferred to the deal price as conclusively establishing fair value is inconsistent with a careful reading of the Business Court's comprehensive judgment. It is correct that the Business Court examined the deal price and found it illustrative of the fair value of the dissenters' shares. But the Business Court in no way suggested that reflexive deference to the deal price would have satisfied its obligation to determine the fair value of the dissenters' shares "using customary and current valuation concepts and techniques," N.C.G.S. § 55-13-01(5), or that a court must consider the deal price in every appraisal proceeding. Instead, the Business Court conducted a thorough analysis and concluded that "under the circumstances present here, . . . the resulting deal price is reliable evidence of RAI's fair value." *Reynolds Am. Inc.*, 2020 WL 2029621, at *64. This approach represents an appropriate exercise of the Business Court's discretion to select valuation methodologies under N.C.G.S. § 55-13-01(5).

¶ 14   Further, the Business Court plainly utilized many other "customary and current valuation concepts and techniques" in addition to considering the deal price when determining fair value. The deal price was not the only input the Business Court considered. For example, the Business Court also examined RAI's "competitive positioning and relationship with BAT in the time leading up to the Merger," *id.* at *14, the tobacco industry's regulatory dynamics, *id.* at *12, an adjusted unaffected

share price analysis, *id.* at *19, "[c]ontemporaneous research analyst commentary," *id.* at *20, valuations produced during the transaction process, *id.* at *33, an analysis of comparable precedent transactions, *id.* at *40, a comparative company analysis, *id.* at *68, and other factors. The Business Court's decision to credit the deal price was informed by the results of these other methods of valuing RAI's shares, which confirmed that the deal price was indicative of fair value. *See, e.g.*, *id.* at *68 ("[T]he DCF analyses performed by [RAI's] Financial Advisors were reliable and constitute persuasive evidence that the fair value of RAI's shares as of the Transaction Date was at or below the deal price of $59.64 per share."). Rather than choose to value the dissenters' shares at no more than the deal price of $59.64 per share *because* that was the deal price, the Business Court utilized a range of acceptable valuation concepts and techniques to arrive at the conclusion that the deal price reflected fair value.

¶ 15        Courts in other jurisdictions, including Delaware, have routinely considered the deal price as evidence of fair value when warranted by the circumstances of a particular transaction. *See, e.g.*, *Brigade Leveraged Cap. Structures Fund Ltd.*, 240 A.3d at 9 (concluding that the trial court did not abuse its discretion when it "relied on the deal price as the most reliable indicator of [the corporation's] fair value"). Here, the Business Court conducted an analysis using various "customary and current valuation concepts and techniques" including but not limited to consideration of the deal price. Accordingly, the dissenters' argument that the Business Court failed to

determine the fair value of their shares in a manner comporting with the legal requirements of N.C.G.S. § 55-13-01(5) is without merit.

**B. It was not an abuse of discretion for the Business Court to consider the deal price as indicative of the fair value of the dissenters' shares.**

In the alternative, the dissenters argue that the Business Court should have accorded the deal price no probative weight in its appraisal given the circumstances surrounding BAT's merger with RAI. According to the dissenters, because the merger was negotiated after "a large inside stockholder ma[d]e an offer and refuse[d] to allow a market check of the price, deal price *cannot* be relied upon as evidence of fair value."

The deal price is only probative in an appraisal proceeding if there exist reasons to believe the deal price reflects fair value. *Cf. DFC Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 349 (Del. 2017) ("[T]here is no presumption in favor of the deal price . . . ."). We agree with the dissenters that when the directors of a corporation being sold have completed a market check,[3] there is typically reason to believe that the deal price reflects fair value. However, we disagree with the dissenters that a court necessarily abuses its discretion when it credits the deal price resulting from a transaction during which a formal market check was not completed.

The reason the completion of a market check prior to completion of a

---

[3] A market check is "an "investigation typically conducted by an investment banking firm . . . as part of a process to determine whether a proposed price for the target . . . is fair." *Market Check*, *Glossary of Stock Market Terms*, NASDAQ, https://www.nasdaq.com/glossary/m/market-check (last visited Dec. 7, 2021).

transaction supports a court's decision to credit the deal price in an appraisal proceeding is that a market check is one way of assuring that a proposed deal price reflects the corporation's fair value. Nevertheless, in the absence of a market check, a court is not compelled to disregard the deal price entirely. We agree with Delaware courts which have declined to identify "minimum requirements for . . . sale processes to meet before the deal price can be considered as a persuasive indicator of fair value." *In re Appraisal of Columbia Pipeline Grp., Inc.*, No. 12736-VCL, 2019 WL 3778370, at \*42 (Del. Ch. Aug. 12, 2019). Absent a market check, a court still retains the discretion to determine whether other "indicia of reliability" exist which give the court reason to trust that the deal price reflects fair value. *In re Panera Bread Co.*, No. 2017-0593-MTZ, 2020 WL 506684, at \*19 (Del. Ch. Jan. 31, 2020). These "indicia of reliability" may include, but are not limited to, "negotiations at arm's-length; board deliberations without any conflicts of interest; buyer due diligence and receipt of confidential information about the company's value . . . seller extraction of multiple price increases . . . [and] the absence of post-signing bidders." *Id.* (cleaned up).

¶ 19        In this case, the Business Court specifically found the presence of "numerous objective indicia of a robust deal process that led to a deal price that reliably reflected RAI's fair value." *Reynolds Am. Inc.*, 2020 WL 2029621, at \*61. This ultimate finding is supported by additional findings concerning the negotiations leading up to the transaction, including the Business Court's finding that the merger was negotiated

at arms-length by a committee of independent board members who "twice rejected BAT's merger offers without countering" and "seriously considered strategic alternatives to a merger with BAT." *Id.* Other relevant findings addressed the contemporaneous reactions to the deal of various participants in the transaction and of neutral, external observers who universally assessed the deal price to be fair. *See, e.g., id.* at *43 (finding that "Mason Capital's letter to the Transaction Committee" reflecting its belief that RAI was worth $54.44 per share "is persuasive evidence of [this dissenting shareholder's] pre-litigation views of RAI's value"). These findings are amply supported by the record. In light of these findings, we conclude that the Business Court did not abuse its discretion in considering the deal price.

¶ 20      We reach this conclusion notwithstanding the facts that BAT was a minority stakeholder in RAI prior to the merger and that it had publicly announced it was opposed to alternative transactions. These facts are certainly relevant when a court assesses "the persuasiveness of the deal price" in an appraisal proceeding, an assessment which always depends upon "the reliability of the sale process that generated it." *In re Stillwater Mining Co.*, No. 2017-0385-JTL, 2019 WL 3943851, at *21 (Del. Ch. Aug. 21, 2019). However, in this case, the Business Court determined that the facts which enhanced the "persuasiveness" of the deal price "outweigh[ed] weaknesses in the sale process." *In re Panera Bread Co.*, 2020 WL 506684, at *19. Given the Business Court's factual findings addressing the circumstances

surrounding the transaction, we do not believe this determination was "manifestly unsupported by reason." *Riddick*, 315 N.C. at 756. Accordingly, we hold that the Business Court did not err in considering the deal price evidence of RAI's fair value.

## C. The Business Court did not err in disregarding the results of the dissenters' made-for-litigation discounted cash flow analysis.

¶ 21 Next, the dissenters challenge the Business Court's refusal to adopt the valuation proposed by their expert, Dr. Mark Zmijewski, resulting from a discounted cash flow (DCF) analysis he prepared in advance of trial. The dissenters challenge the Business Court's decision to disregard Dr. Zmijewski's DCF analysis in two ways. First, the dissenters argue that "[d]espite the uniform agreement that it is the most widely accepted valuation technique," the Business Court failed to base its fair value determination on the results of *any* DCF analysis in violation of the requirements of North Carolina's appraisal statutes. Second, the dissenters argue that the Business Court erred in disregarding Dr. Zmijewski's DCF analysis *specifically* and instead choosing to credit the results of analyses conducted by RAI's financial advisors during the deal process. The dissenters contend that only Dr. Zmijewski's DCF analysis was based on reasonable inputs. We reject the dissenters' claims.

### 1. *The appraisal statutes did not compel the Business Court to utilize a DCF analysis to determine fair value.*

¶ 22 The dissenters' first argument that a court fails to comport with the requirements of N.C.G.S. § 55-13-01(5) if it does not base its fair value determination

on the results of a DCF analysis is inconsistent with the text and purpose of this provision of the appraisal statutes. As the Business Court noted, "[a] DCF analysis is an accepted valuation methodology." *Reynolds Am. Inc.*, 2020 WL 2029621, at \*66 (citing *In re Appraisal of Columbia Pipeline Grp., Inc.*, 2019 WL 3778370, at \*50). As such, a DCF analysis may often be one of the "customary and current valuation concepts and techniques" a court utilizes when determining the fair value of a corporation's shares during an appraisal proceeding. *Cf. Pinson v. Campbell-Taggart, Inc.*, No. CIV.A. 7499, 1989 WL 17438, at \*8 n.11 (Del. Ch. Feb. 28, 1989) ("[T]he discounted cash flow method is widely accepted in the financial community as a legitimate valuation technique. . . . [T]he validity of that technique *qua* valuation methodology is no longer open to question."). Nevertheless, while a court may choose to rely upon a DCF analysis to determine fair value, nothing in North Carolina's appraisal statutes demands that the Business Court do so in every case. A court does not inevitably violate N.C.G.S. § 55-13-01(5) if it chooses to rely upon other "customary and current valuation concepts and techniques" instead of or in addition to a DCF analysis to determine fair value.

### 2. The Business Court did not abuse its discretion in assessing Dr. Zmijewski's DCF analysis to be unreliable.

In the alternative, the dissenters contend that the Business Court abused its discretion in choosing to credit the results of the contemporaneous analyses performed by RAI's financial advisors during the deal process rather than Dr.

Zmijewski's DCF analysis. On this issue, the Business Court found that

> [b]ased on the admissible evidence of record . . . Dissenters'
> valuation of $92.17 is an extreme outlier. It implies a $50
> billion mispricing of RAI's shares . . . . [It] is starkly
> inconsistent with all other evidence of value including the
> market evidence, contemporaneous DCFs, and various
> sanity checks that Dissenters' experts agree are a typical
> part of the valuation process.

*Reynolds Am. Inc.*, 2020 WL 2029621, at \*54. According to the dissenters, the

Business Court's choice to disregard the results of Dr. Zmijewski's DCF analysis was

manifestly unreasonable because his was the only analysis which incorporated a set

of ten-year financial projections RAI created and presented at an internal strategic

planning meeting.

¶ 24        Although the parties agree that a DCF analysis is a universally accepted

method for valuing a company, it is sensitive and its "result . . . depends critically on

its inputs." *Merlin Partners LP v. AutoInfo, Inc.*, No. 8509-VCN, 2015 WL 2069417,

at \*17 (Del. Ch. Apr. 30, 2015). Depending on how the analyst's financial model is

constructed, small changes to its inputs can produce dramatic swings in the resulting

valuation. *See id.* ("For example, small changes to the assumed cost of capital can

dramatically impact the result."). Thus, a court is well within its discretion to reject

the valuation which results from a DCF analysis if the court assesses its underlying

inputs to be unreliable. *Cf. Dell, Inc. v. Magnetar Glob. Event Driven Master Fund

Ltd*, 177 A.3d 1, 37 (Del. 2017) (finding the deal price more persuasive than the

results of a DCF analysis "given the obvious lack of credibility of the petitioners' DCF model—as well as legitimate questions about the reliability of the projections upon which all of the various DCF analyses are based"). Indeed, the fact that the results of a DCF analysis are extremely sensitive to minor variations in the value of a single input may itself be reason to doubt its results. *Cf. In re Panera Bread Co.*, 2020 WL 506684, at *41 (concluding that a particular DCF analysis was "fatal[ly] unreliab[le]" because adjusting one input produced "wild swings in value").

Here, the primary reason the Business Court rejected Dr. Zmijewski's DCF analysis was because it was extremely sensitive to changes to the value of a single input, and the court doubted that Dr. Zmijewski's choice as to where to fix the value of this input was reasonable. The Business Court explained that the discrepancy between Dr. Zmijewski's valuation and the financial advisors' valuation resulted almost entirely from Dr. Zmijewski's choice to assume a "substantially higher" perpetuity growth rate (PGR) than the advisors. *Reynolds Am. Inc.*, 2020 WL 2029621, at *50. The reason Dr. Zmijewski's PGR was "substantially higher" than the advisors' PGR was that it was based on a set of internal RAI projections showing steady short-term growth continuing consistently for ten years, whereas the financial advisors' projections were based on "a long-term view of the prospects of the Company and the industry rather than the specifics of a few nearer-term years." *Id.* at *49. The Business Court found, and the dissenters do not dispute, that "the vast majority of

Zmijewski's valuation is dependent on the PGR that was used." *Id.* at \*51. Given the sensitivity of Dr. Zmijewski's valuation to his choice of PGR, the Business Court made the reasonable choice to closely examine this input.

¶ 26          The Business Court found Dr. Zmijewski's choice of a PGR to be "unreasonable and unreliable." *Id.* at \*51. According to the Business Court, Dr. Zmijewski's selection of a PGR was based on another expert's analysis which

> ignores . . . the substantial evidence showing that these ten-year projections were not intended to create a probability-weighted value of future cash flows, disregarded significant assumptions and sensitivities that could dramatically impact RAI's business, and were largely extrapolations of current industry trends and dynamics without substantial change.

*Id.* Although the dissenters repeatedly attack the Business Court's characterization of the ten-year projections, we cannot say that the court's findings addressing the purpose and utility of the projections are unreasonable. The Business Court expressly found that the ten-year projections were not intended to—and did not in fact—reflect RAI's view of the most likely trajectory of its future cash flows, and were instead useful only for strategic planning purposes because the projections made no effort to account for possible long-term structural threats to RAI's business. *Id.* at \*25. The Business Court also found that "[t]estimony from the [financial advisors] . . . indicates that it was typical when performing valuation work to receive and use five-year projections from management." *Id.* at \*28. These findings are supported by the record

and support the Business Court's decision not to credit the results of Dr. Zmijewski's DCF analysis.

¶ 27    It is also appropriate for courts to be skeptical of the results of DCF analyses that are wildly out of step with "alternative valuation methodologies [used] as a 'sanity check' to test the reasonableness of conclusions based on a particular methodology." *In re Adelphia Commc'ns Corp.*, 512 B.R. 447, 474 (S.D.N.Y. 2014). The Business Court found, and the dissenters do not dispute, that the valuation resulting from Dr. Zmijewski's DCF analysis "far exceeds any other evidence of value in the record and suggests that RAI's management, RAI's Board, RAI's Financial Advisors, RAI's shareholders, stock market analysts, and the market itself mispriced RAI by as much as $50 billion." *Reynolds Am. Inc.*, 2020 WL 2029621, at *35. This would appear to reflect, as the Business Court described, "the largest mispricing ever identified in an appraisal case in North Carolina, Delaware, or elsewhere, by far." *Id.* at *54. Although a court might appropriately choose to credit the outlier results of a DCF analysis when there are reasons to distrust other proposed valuation methodologies, such a dramatic divergence as exhibited here—attributable almost entirely to the modeler's choice of value on a single input—reasonably gave the Business Court cause to doubt the reliability of Dr. Zmijewski's analysis.

¶ 28    A court generally possesses the discretion to choose to accord little probative weight to the results of a particular DCF analysis if there are legitimate justifications

for that choice. Further, a court possesses the discretion to "have greater confidence in market indicators and less confidence in divergent expert determinations," especially when there is "a persuasive market-based metric" such as "the deal price that resulted from a reliable sale process." *In re Stillwater Mining Co.*, No. 2017-0385-JTL, 2019 WL 3943851, at *61. In this case, given the Business Court's findings regarding the unsuitability of RAI's ten-year projections as inputs to a DCF analysis, the comparative reliability of other market-based methodologies, and the vast divergence between the result of the dissenters' made-for-litigation DCF analysis and the deal price along with other contemporaneous indicia of fair value, we have no trouble concluding that the Business Court did not abuse its discretion in choosing not to credit the results of Dr. Zmijewski's DCF analysis.

**D. The Business Court did not err in choosing to credit the results of RAI's adjusted unaffected stock price analysis.**

¶ 29    Next, the dissenters challenge the Business Court's reliance on testimony from RAI's expert witness, Professor Paul Gompers. Professor Gompers presented the results of an adjusted unaffected stock price analysis he conducted which estimated that had the merger with BAT not been announced, the value of a share of RAI on the date the transaction closed would have been between $53.78 and $55.33. The Business Court found Professor Gompers's analysis to be "persuasive evidence that suggests that the deal price is consistent with, and Dissenters' proposed valuation is inconsistent with, RAI's fair value on the Transaction Date." *Reynolds Am. Inc.*, 2020

WL 2029621, at *38.

¶ 30    In a judicial appraisal proceeding, the court is tasked with determining the value of the shares of the corporation subject to the proceeding "immediately before the effectuation of the corporate action as to which the shareholder asserts appraisal rights, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." N.C.G.S. § 55-13-01(5). Public disclosure of a possible impending acquisition can, on its own, drive up the price of the target corporation's shares. *Cf. Elliott Assocs., L.P. v. Covance, Inc.*, No. 00 Civ. 4115 (SAS), 2000 WL 1752848, at *1 (S.D.N.Y. Nov. 28, 2000) (unpublished) ("When two companies announce a merger, their stock prices generally tend to follow a predictable pattern. Normally, the share price of the target will increase following the announcement of a plan to merge, while the acquiror's share price usually declines."). Thus, a court which chooses to consider the market price of the target corporation's shares when assessing fair value may choose to "adjust" the corporation's share price on the transaction date to excise the change in value which itself results from the announcement of the transaction.

¶ 31    In this case, the Business Court found that

> RAI's July 24, 2017 stock price is not a relevant proxy for fair value on the Transaction Date because after BAT's announcement of its October 20 Offer, RAI's stock price would have reflected the expected deal price, including expected synergies created by the Merger, and the market's view of the likelihood of the deal closing.

*Reynolds Am. Inc.*, 2020 WL 2029621, at \*37. To approximate how RAI's stock price would have evolved between the public disclosure of BAT's offer and the closing date, in a counterfactual universe where the public had no knowledge of any possible impending transaction, the Business Court turned to Professor Gompers. His analysis attempted to both exclude the effect on RAI's stock price of the investors' anticipation of the merger and account for the impact "other market industry developments would likely have had on RAI's stock price between BAT's October 20 Offer and the closing of the Merger on July 25, 2017[.]" *Id.* at \*38. Based upon Professor Gompers's analysis, which indexed RAI's stock price "to the performance of its closest competitor, Altria, and to the performance of the S&P 500 generally from October 20, 2016 through July 24, 2017," the Business Court determined that "while RAI's stock price may have appreciated to some degree in the time between the October 20 Offer and the Transaction Date, RAI's stock would still have traded 7% to 10% below the deal price as of July 24, 2017." *Id.*

¶ 32        The dissenters raise numerous arguments challenging the Business Court's reliance on Professor Gompers's adjusted unaffected stock price analysis. Collectively, these claims assert (1) that Professor Gompers's testimony was inadmissible, and (2) that even if the testimony was admissible, his analysis was unreliable. We address these challenges here and conclude they are meritless.

### 1. *Professor Gompers's testimony regarding his adjusted unaffected stock price analysis was admissible.*

¶ 33    We first address the dissenters' evidentiary claim that the Business Court erred in admitting Professor Gompers's testimony. The probative value of a stock price analysis in an appraisal proceeding is connected to the efficiency of the market for the corporation's shares. The probative value of any market price-based analysis is enhanced when the market for the corporation's shares is "semi-strong efficient, meaning that the market's digestion and assessment of all publicly available information concerning [the corporation being assessed] was quickly impounded into the Company's stock price." *Dell, Inc.*, 177 A.3d at 7. When the market is not semi-strong efficient, the corporation's stock price might not reliably reflect its fair value, and evidence regarding the corporation's stock price is likely to be less probative in an appraisal proceeding.

¶ 34    In this case, Professor Gompers did not independently determine that the market for RAI's stock was semi-strong efficient. Instead, Professor Gompers testified that in conducting his analysis, he adopted the conclusion of a different expert, Dr. Anil Shivdasani, who had conducted an analysis which supported his own opinion that the market for RAI shares was semi-strong efficient. Dr. Shivdasani did not testify at trial. According to the dissenters, RAI's failure to elicit testimony from Dr. Shivdasani rendered Professor Gompers's testimony regarding the adjusted unaffected stock price analysis inadmissible. They advance three theories in support

of this contention.

> ### a. The Business Court was not required to draw an inference against RAI based on its failure to call an expert witness.

¶ 35    The dissenters' first theory is that allowing Professor Gompers to present testimony based upon the opinion of a non-testifying expert violated the "missing witness rule." Where it has been recognized, the missing witness rule allows the factfinder to draw an inference regarding a disputed factual issue that is adverse to a party who "fail[s] to call an available witness with peculiar knowledge of the fact to be established." *Yarborough v. Hughes*, 139 N.C. 199, 209 (1905). Dissenters argue that because RAI failed to call Dr. Shivdasani at trial, it was error for the Business Court not to infer that the market for RAI's shares was not semi-strong efficient.

¶ 36    This Court has not formally adopted the missing witness rule. Regardless, even assuming that the missing witness rule is recognized in North Carolina, the dissenters' argument entirely ignores the flexible nature of the rule. Even calling the missing witness rule a "rule" is somewhat of a misnomer. As the Court of Appeals correctly explained in the spoliation of evidence context, these kind of "rules" are really permissible inferences. Under appropriate circumstances, the factfinder "*may draw an inference from the intentional spoliation of evidence that the destroyed evidence would have been unfavorable to the party that destroyed it.*" *McLain v. Taco Bell Corp.*, 137 N.C. App. 179, 183 (2000) (emphasis added) (quoting *Beers v. Bayliner Marine Corp.*, 236 Conn. 769, 775 (1996)). Nothing compels the factfinder to

ultimately draw the requested inference. *Cf. Katkish v. Dist. of Columbia*, 763 A.2d 703, 706 (D.C. 2000) ("Even when the inference is permissible, the finder of fact is free to draw the inference, or not.").

¶ 37        In this case, the Business Court explained that "in the exercise of its discretion," it would "den[y] Dissenters' request for an adverse inference arising from Shivdasani's failure to testify." The reasons the Business Court provided to support its refusal to draw an adverse inference amply justify its decision. After RAI failed to call Dr. Shivdasani, the dissenters possessed the right to introduce Dr. Shivdasani's deposition testimony as substantive evidence at trial. *See* N.C.G.S. § 1A-1, Rule 32(a)(4) (2019) ("The deposition of a witness, whether or not a party, may be used by any party for any purpose if . . . the witness is an expert witness whose testimony has been procured by videotape as provided for under Rule 30(b)(4)."). They chose not to exercise this right. As the dissenters themselves acknowledge, Dr. Shivdasani's "expert report . . . opined that the economic evidence was consistent with RAI stock trading in a semi-strong efficient market." Although the dissenters also contend that the "event study" upon which Dr. Shivdasani's opinion was based "demonstrated that RAI's market was *inefficient*," if that were correct, nothing prevented them from questioning Dr. Shivdasani about this discrepancy during his deposition and introducing that testimony as substantive evidence at trial. Deposition testimony is certainly not the same as live witness testimony, but the dissenters' choice not to

exercise their procedural right to introduce Dr. Shivdasani's testimony supports the Business Court's assessment that the substance of his testimony would not have bolstered the dissenters' argument.

¶ 38          Further, Dr. Shivdasani did not possess any factual information he alone could testify to which was otherwise unavailable to the dissenters, given the nature of the questions he was tasked with answering and the availability of pretrial discovery of expert-witness reports. Nothing prevented the dissenters from introducing evidence at trial that the market for RAI's shares was not semi-strong efficient. As the Supreme Court of New Jersey has explained,

> an expert is unlikely to be in exclusive possession of factual evidence that would justify an adverse inference charge. . . . Rarely will an expert be in a position to reveal previously undisclosed factual information, for the first time, on the stand at trial. . . . [I]t is the unusual setting in which a party's decision not to call an expert witness will be prompted by the party's fear that the expert will reveal unfavorable facts that would otherwise not be disclosed.

*Washington v. Perez*, 219 N.J. 338, 361–62, 98 A.3d 1140, 1153–54 (2014). Therefore, the Business Court did not err by choosing not to draw an adverse inference against RAI based upon RAI's failure to call Dr. Shivdasani to testify.

b. *Direct expert-witness testimony was not required to prove that the market for RAI's shares was semi-strong efficient.*

¶ 39          In the alternative, the dissenters assert that the predicate question of whether a market is semi-strong efficient can only be answered by direct expert-witness

testimony. The Business Court found, and RAI does not dispute, that "RAI did not offer expert testimony to establish that the market for RAI's stock was semi-strong form efficient." *Reynolds Am. Inc.*, 2020 WL 2029621, at *36 n.37. However, the court concluded "that expert testimony on market efficiency is not necessary to the Court's determination in light of the undisputed evidence of record establishing that the market for RAI's shares was semi-strong efficient at the time of the Merger." *Id.* The dissenters argue that in the absence of expert-witness testimony, the Business Court was not at liberty to conclude that the market for RAI's shares was semi-strong efficient and that, by extension, the court could neither admit nor credit Professor Gompers's testimony regarding his adjusted unaffected stock price analysis.

¶ 40        We decline to adopt a bright-line rule which would prohibit a court from finding that the market for a corporation's shares is semi-strong efficient in the absence of direct expert-witness testimony. Although direct expert-witness testimony may bolster a party's argument that a market is semi-strong efficient, market efficiency is "not [an] all-or-nothing concept[ ]," and the "operative question" in an appraisal proceeding is whether a given market is "efficient enough . . . to warrant considering the trading price as a valuation indicator when determining fair value." *In re Stillwater Mining Co.*, No. 2017-0385-JTL, 2019 WL 3943851, at *52. As the Supreme Court of Delaware has explained,

> [a] market is more likely efficient, or semi-strong efficient,
> if it has many stockholders; no controlling stockholder;

> highly active trading; and if information about the company is widely available and easily disseminated to the market. In such circumstances, a company's stock price reflects the judgments of many stockholders about the company's future prospects, based on public filings, industry information, and research conducted by equity analysts. In these circumstances, a mass of investors quickly digests all publicly available information about a company, and in trading the company's stock, recalibrates its price to reflect the market's adjusted, consensus valuation of the company.

*Dell, Inc.*, 177 A.3d at 25 (cleaned up). A court which receives competent evidence addressing these and other relevant factors may find that a market is semi-strong efficient with or without direct expert-witness testimony.[4] While that evidence may include an expert's opinion that the market is efficient, an expert's opinion is not strictly necessary. *See, e.g.*, *In re Appraisal of Solera Holdings, Inc.*, No. 12080-CB, 2018 WL 3625644, at \*24 (Del. Ch. July 30, 2018) (determining that "the record supports the conclusion that the market for [the company's] stock was efficient and well-functioning" based on the company's market capitalization, weekly trading volume, bid-ask spread, short-interest ratio, amount of analyst coverage, and price responsiveness to public release of information about the company). Accordingly, we

---

[4] To be sure, expert testimony may help the Business Court knowledgeably examine these factors. *In re Stillwater Mining Co.*, No. 2017-0385-JTL, 2019 WL 3943851, at \*50 (Del. Ch. Aug. 21, 2019) (explaining that the "the guidance of experts trained in" economics and corporate finance can help "law-trained judges" navigate "the thicket of market efficiency"). Nevertheless, we conclude that a party need not present expert testimony specifically conveying that expert's ultimate opinion regarding market efficiency if the party has presented sufficient evidence regarding the relevant factors to allow the trial court to make its own efficiency determination.

reject the dissenters' argument that the Business Court's admission of and reliance on Professor Gompers's adjusted unaffected stock price analysis was erroneous because market efficiency was not directly established via direct expert-witness testimony.

### c. *Professor Gompers's testimony was not otherwise inadmissible.*

Additionally, the dissenters contend that Professor Gompers's testimony was inadmissible because he impermissibly vouched for the results of analyses conducted by RAI's financial advisors. At trial, Professor Gompers testified that he had examined the analyses performed by RAI's financial advisors in conducting his own analysis of the value of RAI's shares. He explained that, in his view, it was appropriate to use five-year projections in performing a DCF analysis, as the financial advisors had. By contrast, he explained that he had significant reservations about the inputs Dr. Zmijewski relied on in conducting his DCF analysis.

The crux of the dissenters' argument is that Professor Gompers did not perform an independent analysis which formed the basis of his opinion as to the fair value of RAI or the reliability of the various inputs utilized in other valuation analyses. By extension, the dissenters argue that his testimony regarding the financial advisors' analyses did nothing more than "parrot" their opinions and "vouch" for their credibility.

In general, an expert witness is not permitted to convey an opinion regarding

another witness's credibility, as credibility determinations are left to the factfinder. *See, e.g.*, *State v. Warden*, 376 N.C. 503, 507 (2020) ("[I]t is typically improper for a party to seek to have the witnesses vouch for the veracity of another witness." (cleaned up)). However, an expert is permitted to offer an opinion based upon materials that would otherwise be inadmissible as evidence, provided that the materials are "of a type reasonably relied upon by experts in the particular field." N.C.G.S. § 8C-1, Rule 703 (2019). An expert is permitted to testify regarding how and why he or she adopted certain assumptions contained in those materials—and disregarded others—when conducting his or her own independent analysis, provided that the expert has "form[ed] his [or her] own opinions by applying his [or her] extensive experience and a reliable methodology to the inadmissible materials." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (cleaned up).

¶ 44      In this case, Professor Gompers explained how and why his independent analysis of the value of RAI bolstered his assessment of "the validity and reasonableness of the Financial Advisors' inputs, analyses, and valuations." *Reynolds Am. Inc.*, 2020 WL 2029621, at \*74. As the Business Court explained, Professor Gompers "performed his own detailed, independent analyses using customary valuation techniques and relying on his training and expertise as a financial economist." *Id.* Professor Gompers then testified that the results of his analysis "all line[d] up a lot" with the financial advisors' analyses, and with every other attempt

to value RAI's shares except for the results of the analysis performed by Dr. Zmijewski, which were, in Professor Gompers's estimation, "way off." For example, Professor Gompers testified that based on the "comparable companies" and "precedent transaction" analyses he conducted, he would have had "serious concern[s] about the assumptions" he was making if he had performed a DCF analysis which produced a valuation of RAI's shares similar to the result of Dr. Zmijewski's analysis. This made Professor Gompers more confident in the assumptions underpinning the financial advisors' analyses and less confident in the assumptions underpinning Dr. Zmijewski's DCF analysis.

¶ 45      The dissenters' argument that this testimony was improper again implies that the only "customary and current valuation concept[ ] and technique[ ]" permitted under N.C.G.S. § 55-13-01(5) is a DCF analysis. While a DCF analysis is one widely accepted method of valuing a company, it is not the only one. Professor Gompers testified that he "read every single analyst report around the deal, around the merger, for both RAI and for BAT" because reviewing these kinds of contemporaneous reports was something that financial economists "absolutely" do whenever they attempt to assess the value of a company. He also testified to the results of the valuation analyses he performed using other "customary and current valuation concepts and techniques," N.C.G.S. § 55-13-01(5), including his "own comparable company and precedent transaction analys[e]s." Professor Gompers did not testify that he believed

the financial advisors' valuation was reasonable and Dr. Zmijewski's was unreasonable because he believed the advisors were more credible than Dr. Zmijewski. Instead, he utilized his expertise as a financial economist to value RAI and, in the process, examined the various assumptions underpinning different attempts to value RAI which he incorporated into his own independent analysis. He ultimately "g[ave] his *own* opinion" as to the value of RAI's shares, rather than serving as a "mouthpiece" for the financial advisors. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664–66 (S.D.N.Y. 2007). Accordingly, the Business Court did not err in admitting Professor Gompers's testimony.[5]

### 2. The Business Court did not abuse its discretion in choosing to credit Professor Gompers's adjusted unaffected stock price analysis.

¶ 46    The dissenters' next set of arguments challenge the Business Court's decision to rely upon Professor Gompers's adjusted unaffected stock price analysis. The Business Court found that

> [e]xperts for both sides . . . agreed that the market for most publicly traded stocks on most days is close to semi-strong form efficient, particularly stock for large companies like RAI. (Yilmaz Tr. 1967:7–13; Gompers Tr. 785:3–8.) Although both sides' experts agreed that the fact a company is widely traded on a national exchange does not mean it automatically trades in a semi-strong efficient market at any given point, (Gompers Tr. 833:23–834:6; Zmijewski Tr. 1320:17–1321:2), given the evidence introduced by RAI, which was not disputed by Dissenters,

---

[5] For these reasons, we also reject the dissenters' argument that Professor Gompers's testimony impermissibly summarized factual evidence and provided a recitation of hearsay.

there is a sufficient factual record for the Court to determine that the market for RAI's stock was semi-strong form efficient:

> a. Until the Merger, RAI was publicly traded in high volumes and with high liquidity on the NYSE, the largest stock exchange by market capitalization and monthly trading volume in the world. (JX0017.0003.)

> b. RAI was a very large company with a market capitalization of approximately $67.3 billion on October 20, 2016. (Gompers Tr. 777:25–778:10; PX0115.0181.)

> c. Information about RAI was both widely available and readily disseminated to the market. (de Gennaro Tr. 215:15–23 ("No indication that the market wasn't absorbing news on a regular basis.").) For most public companies, "most of the relevant information is disclosed." (Wajnert Tr. 124:4–7.)

> d. RAI's historical stock price increased and decreased in relation to the release of new Company-specific information and market-wide trends. (Wajnert Tr. 59:10–60:4; de Gennaro Tr. 215:15–23.)

> e. RAI's stock was followed by 16 equity analysts, who frequently published research about the Company. (PX0063.0010, .0025; de Gennaro Tr. 187:18–188:8 (RAI was "a well-covered company . . . . A lot of analysts issued regular reports.").) These analysts were well-informed about RAI's business and the U.S. tobacco industry. (PX0063.0010, .0025; de Gennaro Tr. 187:18–188:8, 199:2–19.)

> f. RAI did not have a controlling shareholder at any time prior to the Merger. (JX0023.0080; Wajnert Tr. 63:18–64:18.)

*Reynolds Am. Inc.,* 2020 WL 2029621, at \*36. The dissenters do not directly challenge any of these underlying factual findings as unsupported by the evidence. Therefore, in examining the dissenters' legal arguments, these findings of fact are binding on appeal. *King v. Bryant*, 369 N.C. 451, 463 (2017). None of the dissenters' legal arguments on this issue are persuasive.

### a. The Business Court considered appropriate factors in examining market efficiency.

First, the dissenters argue that the factors the Business Court identified as supporting its determination that the market for RAI's shares was semi-strong efficient—and which, by extension, supported its decision to credit Professor Gompers's adjusted unaffected stock price analysis in its fair value determination— were "not a reliable tool for identifying the type of market efficiency that matters in appraisal litigation." According to the dissenters, the Business Court "pointed to the so-called '*Cammer* Factors' as supporting market efficiency," even though the case those factors are drawn from, *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), involved "the 'fraud on the market' theory . . . in federal securities fraud litigation," which "sheds no light whatsoever on what the 'true value' or 'fair value' of the stock is."

The dissenters are correct that the Business Court cited *Cammer* in explaining how courts in other jurisdictions "have identified numerous factual criteria to be considered in assessing whether the market for a particular security is efficient."

*Reynolds Am. Inc.*, 2020 WL 2029621, at \*74. However, the Business Court also relied upon other cases in which courts considered many of the same factors examined by the Business Court when assessing market efficiency for the purposes of conducting a judicial appraisal. *Id.* (citing *In re Appraisal of Jarden Corp.*, No. 12456-VCS, 2019 WL 3244085, at \*27 (Del. Ch. July 19, 2019), and *In re Appraisal of Solera Holdings, Inc.*, No. 12080-CB, 2018 WL 3625644 (Del. Ch. July 30, 2018)). Delaware courts have expressly identified similar factors as relevant when determining market efficiency in appraisal proceedings. *See Dell, Inc.*, 177 A.3d at 7. And Delaware courts have explicitly relied upon the *Cammer* factors in this same context. *See In re Stillwater Mining Co.*, No. 2017-0385-JTL, 2019 WL 3943851, at \*56 ("Absent any countervailing evidence, [the expert witness's] analysis of the *Cammer* . . . factors would support a finding that the trading market for [the corporation's] common stock had sufficient attributes to be regarded as informationally efficient."). We find these cases persuasive. Accordingly, the Business Court did not err when it examined these factors in assessing market efficiency.

> b. *The Business Court did not fail to account for the existence of any material nonpublic information; instead, it permissibly found that no material nonpublic information existed.*

¶ 49    Second, the dissenters argue that the Business Court failed to account for the existence of "material non-public information that BAT had and the investing public did not." A purchaser's possession of material nonpublic information could render the

target corporation's stock price "unreliable" if there is "sufficient information asymmetry between the market and insiders." *Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313, 326 (Del. 2020). When this occurs, a corporation's stock price may not reflect the corporation's fair value because the market lacks pertinent information traders would likely have reacted to in the event this information had been publicly disclosed. In this case, the dissenters identify two sources of purportedly material nonpublic information which BAT possessed: (1) RAI's internal documents which projected "7[ to ]8% growth in years six through ten of its ten-year projections," and (2) the knowledge that "RAI management had been authorized to purchase up to $2 billion of RAI stock on the public markets at prices up to $65 per share."

¶ 50     The Business Court specifically found that the information identified by the dissenters was not material.

> 203. Dissenters also sought to prove at trial that RAI's stock price was not a reliable indicator of fair value because of the existence of certain material nonpublic information that was not reflected in the stock price: (i) the Top-Side Adjustments to the October 2016 Projections provided to the Financial Advisors, (ii) the projected growth rates for years six through ten in the June 2016 LE, and (iii) the $65 share repurchase authorization ceiling. (*See* Defs.' Resp. Post-Trial Br. 22–24.) None of this nonpublic information warrants disregarding RAI's Unaffected Stock Price as evidence of value. Indeed, Dissenters' expert, Yilmaz, admitted that he did not have an opinion "one way or the other on whether the private information at the company, on balance, was more negative or more positive[.]" (Yilmaz Tr. 1959:1–12 ("Given that I have not done the work, I [can] not opine on that.").)

204. First, the Top-Side Adjustments amounted to an additional $1.4 billion in RAI's income before taxes, or roughly $300 million added to each year of the five-year projections. (DX240, at tab "top side adj," row 14; Price Tr. 989:18–990:16.) As of the record date of June 12, 2017, RAI had approximately 1.426 billion shares of common stock outstanding. (JX0023.0029.) Given RAI's immense size, public disclosure of this additional projected income would not likely have affected the stock price in a meaningful way, and it does not undermine the relevance of the Unaffected Stock Price as evidence of value. There is certainly no basis to find that this information could justify the massive premiums to RAI's Unaffected Stock Price for which Dissenters advocate. Further, some of the Top-Side Adjustments were based on public information that had not yet been incorporated into the October 2016 LE, such as changes to state tax laws and effects from positive stock market performance. (Price Tr. 957:22–958:6.)

205. Next, as discussed previously, the growth rates in years six through ten of the June 2016 LE were based largely on extrapolations of current volume and pricing trends in the industry, which were publicly available and therefore already likely to be reflected in RAI's stock price. (Gilchrist Tr. 375:2–24, 404:9–406:6, 529:12–25.)

206. Moreover, and also as previously discussed, RAI management credibly testified—and the documents relating to the ten-year projections confirmed—that the projections for these later years did not account for any of the various serious risks facing the Company. (DX0023.0002; Gilchrist Tr. 410:8–412:2.) In particular, they were not intended to be used to value RAI's shares but only in connection with certain limited planning objectives. The projected growth rates were not based on any underlying material, value-relevant information about specific business plans or other developments. They did not constitute the kind of information that, if disclosed, would have meaningfully affected the stock price, and they do not provide any reason to believe that the fair value of RAI

materially deviated from the Unaffected Stock Price. Dissenters do not contest that RAI was not required to have disclosed these projections. (Yilmaz Tr. 1959:15–25.)

207. Finally, the authorization ceiling for the share repurchase approved by the Board is not material, value-relevant information because it was not a valuation of RAI. Rather, as discussed above, it was an internal corporate authorization for a purchasing program, which was intentionally set at a price that was higher than what RAI management ever expected it would need to spend. (Gilchrist Tr. 414:19–415:1.) Indeed, Zmijewski pointedly declined to testify that the authorization ceiling was value-relevant information even when prompted by counsel. (Zmijewski Tr. 1316:10–1317:3.)

*Reynolds Am. Inc.*, 2020 WL 2029621, at \*37. Once again, we are not entitled to disregard these findings if they are supported by competent evidence.

¶ 51     Here, the record evidence identified by the Business Court supports its finding that the six-to-ten-year projections were created to model one possible scenario for RAI's future which intentionally did not account for long-term structural risks to the business. The record evidence also supports its finding that the share purchase authorization did not reflect the Board of Directors' actual assessment of the value of RAI's shares. The Business Court did not abuse its discretion in concluding that materials which revealed little about how RAI valued its own business would not have caused the market to alter its assessment of RAI's value had the materials been publicly disclosed.

*c. The Business Court did not fail to account for the timing of BAT's offer.*

Third, the dissenters argue that Professor Gompers's adjusted unaffected stock price analysis did not reflect the fair value of their shares because the Business Court failed to account for "the timing of BAT's offer [which] appeared timed to take advantage of a 12% sell-off in the price of RAI stock that occurred immediately prior to the offer." This argument suffers from the same deficiency as the dissenters' previous argument in that it entirely ignores the Business Court's factual findings directly addressing this claim.

> 197. On October 20, 2016, RAI's common stock closed at $47.17 per share (the "Unaffected Stock Price"). (Corr. Stip'd Facts ¶ 13.) The evidence shows that this price did not represent a substantial deviation from the price at which RAI's stock was previously trading. RAI's 52-week trading average prior to BAT's initial offer was approximately $49.00. (PX0115.0258.) RAI's common stock hit its all-time high of $54.48 per share on July 5, 2016. (PX0115.0390.) In fact, RAI's share price had realized significant gains in the years leading up to BAT's initial offer. (PX0063.0039.)
>
> 198. RAI's stock was trading "at a peak multiple in the marketplace" prior to BAT's October 20 offer. (Gilchrist Tr. 560:22–561:11.) Although RAI's share price had dropped at that time from its all-time high three months before, from the time the Lorillard Transaction closed in June 2015 until October 20, 2016, the volume weighted average price of RAI stock was $46.26—slightly below the Unaffected Stock Price. And trading data shows that the deal price was substantially above prior price levels[.]

*Reynolds Am. Inc.*, 2020 WL 2029621, at *35. For the reasons stated above, we will

not disturb the Business Court's findings on this issue. Therefore, we reject the dissenters' argument that Professor Gompers's adjusted unaffected stock price analysis was not reflective of fair value due to the timing of BAT's offer.

> d. *The Business Court did not err by failing to award the dissenters a control premium.*

¶ 53 Fourth, the dissenters argue that Professor Gompers's adjusted unaffected share price analysis did not reflect the fair value of their shares because the analysis "did not reflect a control premium." "A control premium is an upward adjustment to the value of stock when the block of stock being valued enables the holder to control the corporation." Jay W. Eisenhofer & John L. Reed, *Valuation Litigation*, 22 Del. J. Corp. L. 37, 135 (1997). In contrast to a person or entity who owns only a minority stake in a corporation, a person or entity who obtains a controlling stake in a corporation "can elect directors, appoint management, declare and pay dividends, determine corporate policy, etc." *Id.* Thus, a share of a corporation is theoretically worth more to the purchaser when the share enables the purchaser to obtain a controlling stake in the corporation than it is to any individual minority shareholder, because the controlling stakeholder can "captur[e] synergies with the assets already owned by the new controller or by reducing agency costs through managing the company differently." Lawrence A. Hamermesh & Michael L. Wachter, *The Short and Puzzling Life of the "Implicit Minority Discount" in Delaware Appraisal Law*, 156 U. Pa. L. Rev. 1, 52 (2007).

¶ 54        The Business Court considered and rejected the dissenters' argument that it was required to award the dissenters a "control premium" to correct for the possibility that the price of RAI's publicly traded shares "implicitly contain[ed] a minority discount."[6] *Reynolds Am. Inc.*, 2020 WL 2029621, at \*66. According to the Business Court, the dissenters' argument might "have some currency in closely-held corporations, [but] it has no application here in the public company setting . . . [because] 'not a single piece of financial or empirical scholarship affirms . . . that public company shares systematically trade at a substantial discount to the net present value of the corporation.' " *Id.* (quoting Hamermesh & Wachter at 5–6). In addition, the Business Court reasoned that the dissenters were not entitled to recoup a share of the premium which accrued to BAT upon obtaining a sole ownership of RAI for the following reasons:

> 299. The value attributable to a control premium is a subjective value on behalf of the acquirer; that is, it only reflects the value that the acquirer believes it can add. (Gompers Tr. 912:10–17 ("[S]omebody buys the assets because *they believe* that they're going to be better. They're going to be able to, you know, fire lazy managers and the

---

[6] A minority discount is, at least conceptually, the converse of a control premium: it is the valuation of a share held by a minority stakeholder at a lesser value than the stakeholder's pro rata share of the value of the total corporation because of the fact that the minority stakeholder cannot exercise control over the corporation. *See, e.g.*, Richard A. Booth, *Minority Discounts and Control Premiums in Appraisal Proceedings*, 57 Bus. Law. 127 (2001); *see also* Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value,* 47 Duke L.J. 613, 641 n.136 (1998) ("The term 'minority discount' refers to a valuation of minority shares at less than their proportionate share of the value of the corporation as a whole, reflecting the minority shareholder's inability to exercise control over corporate decisionmaking.").

like." (emphasis added)).) Because this value is unique to the particular acquirer—here, BAT—the "control premium represents the value only under the control of the [acquirer]." (Gompers Tr. 912:17–18.)

300. As Yilmaz testified, a company's value is determined from the perspective of "an independent firm that is expected to go on as an independent entity[.]" (Yilmaz Tr. 1866:24–1867:7.) Yilmaz clarified: "Just to be sure we are all on the same page, this does not have any kind of minority discount or some kind of acquisition premium or control premium attached to it." (Yilmaz Tr. 1867:8–10.) Gompers agreed with Yilmaz: "So if what you're trying to value is the firm, the fair value of the firm, assuming no transaction, you should not gross it up by some control premium." (Gompers Tr. 911:7–9.)

301. Thus, evidence relating to whether certain calculations in the record need to have a control premium added to them to be reflective of RAI's fair value is neither persuasive nor relevant in determining RAI's fair value here. (Wajnert Tr. 165:23–166:4, 167:10–17, 168:4–13; Gilchrist Tr. 551:1–17; Gompers Tr. 846:16–848:9, 854:24–855:3, 858:5–22, 901:19–902:16, 908:10–18; DX0277.0019–.0020; PX0115.0397–.0398; DX0277.0019–0020; PX0115.0397–0398; Constantino Tr. 1829:24–1830:3, 1830:10–24, 1848:16–18.)

*Reynolds Am. Inc.*, 2020 WL 2029621, at *54.

¶ 55     The Business Court's explanation for rejecting the dissenters' control premium argument implicates two distinct questions. The first is primarily methodological. When a court credits a publicly held corporation's adjusted unaffected share price as an indicator of the fair value of that corporation in an appraisal proceeding, should the court presume that the share price reflects an implicit minority discount? The

second is primarily legal. If a corporation's adjusted unaffected share price does reflect an implicit minority discount, must a court account for the discount by allocating some or all of the control premium which accrues to the controlling stakeholder to the dissenting shareholders?

¶ 56     The Business Court and the dissenters both answer these questions with a generalizable rule. The Business Court concluded that the price of publicly traded corporations categorically does not reflect an implicit minority discount. *Reynolds Am. Inc.*, 2020 WL 2029621, at \*66. Further, the Business Court reasoned that even if publicly traded corporations do trade at a discount, dissenting shareholders are categorically not entitled to any share of the control premium accruing to a controlling stakeholder because the premium is created by the purchaser. *Id.* at \*54. By contrast, the dissenters argue that "market-based valuation metrics adopted by the Business Court (trading price and adjusted trading price) reflect a minority discount that . . . must be accounted for" whenever a court appraises the value of shares held by a minority stakeholder. They argue that a court *must* award dissenting shareholders a pro rata share of the control premium because "[c]ontrol is inherent in the corporation and does not come into existence as a result of the transaction at issue."

¶ 57     We are not prepared to go so far as to establish a blanket rule on the record before us in this case. Instead, we hold that a court's decision to find that a particular market-based method of valuing a corporation does or does not reflect an implicit

minority discount—and a court's separate decision to allow or reject a dissenting shareholder's claim to their pro rata portion of a control premium—should be based on the record before the court in each particular case.

¶ 58        Our decision not to impose a universal rule is in part a reflection of the unsettled nature of the law and scholarship on this issue. While courts have at times described the implicit minority discount as "inherent" in certain market-based valuation methodologies, *see e.g.*, *Lane v. Cancer Treatment Ctrs. of Am., Inc.*, No. 12207-NC, 2004 WL 1752847, at *35 (Del. Ch. July 30, 2004) (unpublished) (explaining that comparative company analyses suffer from an "inherent minority discount"), the more recent cases suggest it is inappropriate to presume that market-based valuation metrics systematically misvalue corporations that trade on an efficient market, *see, e.g.*, *In re Stillwater Mining Co.*, No. 2017-0385-JTL, 2019 WL 3943851, at *51 (explaining that "[f]or purposes of determining fair value in an appraisal proceeding . . . the trading price has a lot going for it" and citing to various articles critiquing the presumption that the shares of public corporations trade at an implicit minority discount). One recent decision acknowledged "a period when [the Delaware] court added a control premium to an appraisal valuation derived from a comparable company methodology to correct for the implicit minority discount that *was understood* to infect that method," implying by use of the past tense that the time for presuming the existence of an implicit minority discount and automatically

adding a control premium has passed. *In re Appraisal of Regal Ent. Grp.*, No. 2018-0266-JTL, 2021 WL 1916364, at \*51 (Del. Ch. May 13, 2021) (emphasis added) (unpublished). Read together, these cases suggest an unresolved tension between the presumption that efficient markets reliably reflect fair value and the presumption that even efficient markets inevitably undervalue the shares of publicly traded corporations. We believe this tension counsels against adopting a universal legal presumption that any given market-based valuation methodology does or does not reflect an implicit minority discount.

¶ 59        In addition, corporate law scholars are not uniformly in agreement that it is appropriate to assume all market-based methodologies necessarily undervalue the shares held by minority stakeholders. As the Business Court noted, two scholars have asserted that "not a single piece of financial or empirical scholarship affirms the core premise . . . that public company shares systematically trade at a substantial discount to the net present value of the corporation." *Id.* at 5. The authors of that article are not alone in their skepticism. *See also* Richard A. Booth, *Minority Discounts and Control Premiums in Appraisal Proceedings*, 57 Bus. Law. 127, 128 (2001) ("[T]here is no basis for the assumption that market prices *routinely* build in a minority discount."); R. Scott Widen, *Delaware Law, Financial Theory and Investment Banking Valuation Practice*, 4 N.Y.U. J.L. & Bus. 579, 602 n.101 (2008) ("[T]he prices of publicly traded securities do not include a minority discount."); William J. Carney

& Mark Heimendinger, *Appraising the Nonexistent: The Delaware Courts' Struggle with Control Premiums*, 152 U. Pa. L. Rev. 845, 863 (2003) (criticizing the Delaware courts' then-existing "operative assumption" that "all publicly traded shares reflect an implicit minority discount"). Although there are certainly countervailing opinions, there does not appear to be a consensus view.

¶ 60        In this case, we will not presume that the price of RAI's shares reflected an implicit minority discount in the absence of any evidence in the record to support this assertion. As we have noted, "[i]n a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions." *Brigade Leveraged Cap. Structures Fund Ltd.*, 240 A.3d at 17 (quoting *M.G. Bancorp., Inc.*, 737 A.2d at 520). A dissenting shareholder seeking to challenge the reliability of a market-based valuation technique must present evidence from which the trial court could conclude that a particular market-based valuation methodology undervalues the corporation's shares. Because the existence and magnitude of any implicit minority discount—and the magnitude and availability to the dissenting shareholders of any control premium—depends on the nature of the transaction, corporation, and market at issue in any given appraisal proceeding, we reject the notion that a court necessarily commits legal error by failing to correct a market-based valuation methodology for an implicit minority discount or by failing to award the dissenting shareholders a control premium.

In this case, we disagree with the dissenters that the existence of an implicit minority discount is so self-evident as to warrant imposing a legal presumption in the absence of record evidence. *Cf. Kleinwort Benson Ltd. v. Silgan Corp.*, No. 11107, 1995 WL 376911, at *3 (Del. Ch. June 15, 1995) ("Petitioners cannot add a premium to the market price unless they prove that publicly traded shares include a minority discount.").[7] The dissenters have not identified any testimony or record evidence supporting their assertion that RAI's share price reflected an implicit minority discount. They have made no attempt to estimate the size of any such discount. We will not presume that which the dissenters have made no effort to prove. Accordingly, we conclude that the Business Court did not err in crediting Professor Gompers's adjusted unaffected stock price analysis without accounting for an implicit minority discount. Because the dissenters have not shown that any methodology the Business Court relied upon underestimated the fair value of their shares, we also conclude that the Business Court could not have erred in refusing to award the dissenters a pro rata share of any control premium obtained by BAT.

---

[7] Further, the fact that a corporation's market share price may reflect an implicit minority discount does not necessarily mean that a minority stakeholder is entitled to some or all of the control premium obtained by the purchaser. Accordingly, in a future case where a dissenting shareholder is able to prove that a valuation methodology undervalued their shares because the methodology reflected an implicit minority discount, the dissenting shareholder would also need to present evidence regarding the size of the discount and the corresponding amount the shareholder is entitled to under our appraisal statutes. *See DFC Glob. Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 368 n.111 (Del. 2017) ("[I]n order to value a company as a going concern, synergies must be excluded.").

### E. The Business Court determined the fair value of RAI's shares on the date the merger closed.

The dissenters' final challenge to the Business Court's fair value determination is their claim that the Business Court "fail[ed] to value RAI as of the Transaction Date," which the dissenters contend "is an error of law warranting reversal of the decision below." The Business Court determined that "the fair value of RAI *at the Merger closing on July 25, 2017* was no more than the deal price of $59.64." *Reynolds Am. Inc.*, 2020 WL 2029621, at *35 (emphasis added). In the dissenters' view, notwithstanding the Business Court's express (and repeated) attestations that it was valuing their shares as of the date the merger closed, the Business Court actually valued RAI's shares as of an earlier date.

All parties agree that N.C.G.S. § 55-13-01(5) required the Business Court to value the dissenters' shares as of the transaction date. After careful review, we conclude that the Business Court adhered to this requirement.

The dissenters' primary argument to the contrary rests on a faulty syllogism. According to the dissenters, if the Business Court determined that the fair value of RAI's shares was no more than the $59.64 per share that RAI paid upon receiving the notice of appraisal, and if $59.64 per share was the value of the merger consideration on the date BAT and RAI agreed to merge, then the Business Court necessarily valued the dissenters' shares as of the date BAT and RAI agreed to merge. But "fair value" as defined under N.C.G.S. § 55-13-01(5) is not the same as the best possible

value the sellers could have extracted or the value the sellers were ultimately able to extract. The dissenters chose to avail themselves of the judicial appraisal process. There was no guarantee that the court would determine fair value to be equal to or greater than the actual deal price. Indeed, as the Business Court noted, "some analysts perceived BAT to be overpaying or at least purchasing at a time when RAI was trading at a relatively high multiple to its earnings." *Reynolds Am. Inc.*, 2020 WL 2029621, at *20. The fact that the Business Court determined the fair value of the dissenters' shares to be less than the deal price does not prove that the Business Court failed to assess fair value at the proper moment in time.

¶ 65          Additionally, the dissenters argue that the rise in value of the merger consideration—which was caused by growth in the price of BAT's shares—necessarily reflected an increase in "RAI's standalone value, including the increased likelihood of corporate tax reform and an accommodative regulatory climate for the US tobacco industry." "[I]n an appraisal proceeding, the party seeking an adjustment to the deal price reflecting a valuation change between signing and closing bears the burden to identify that change and prove the amount to be adjusted." *Brigade Leveraged Cap. Structures Fund Ltd.*, 240 A.3d at 17. The dissenters bore the burden of proving both that there was value accretion after the merger agreement and that the growth in value was attributable to RAI, excluding value accretion in anticipation of the merger. After meeting that burden, the dissenters further needed to prove that the

value accretion rendered the Business Court's determination of fair value too low.

¶ 66    Here, the Business Court relied upon Professor Gompers's adjusted unaffected stock price analysis, which specifically accounted for the possibility that "in the time between the October 20 Offer and the Transaction Date, events took place that may have affected RAI's standalone value and been reflected in RAI's stock price had BAT not made its October 20 Offer." *Reynolds Am. Inc.*, 2020 WL 2029621, at *38. Based on the results of that analysis, the Business Court determined that "while RAI's stock price may have appreciated to some degree in the time between the October 20 Offer and the Transaction Date, RAI's stock would still have traded 7% to 10% below the deal price as of July 24, 2017." *Id.* Thus, even after accounting for the likelihood that RAI's shares would have appreciated in the absence of the merger announcement, the Business Court—cross-checking the results of Professor Gompers's analysis with the results of numerous other analyses presented at trial—determined that the fair value of RAI's shares on the date of closing did not exceed the value of the merger consideration on the date of the merger agreement. Rather than commit legal error, the Business Court was appropriately "unconvinced by [the dissenters'] conclusory arguments for an adjustment to the deal price and declined to grant the adjustment because [they] failed to meet their burden of proof." *Brigade Leveraged Cap. Structures Fund Ltd.*, 240 A.3d at 17.

## IV. The dissenters' claim that they are entitled to additional interest payments

¶ 67        Finally, the dissenters contend that they are entitled to "interest . . . calculated on the total fair value amount, not any difference between that amount and the amount already paid." Put another way, the dissenters argue that North Carolina law "requires judgment to be calculated by starting with the adjudged fair value of RAI's shares, add[ing] interest at the legal rate through the date of judgment, and then subtract[ing] the amounts already paid." *Reynolds Am. Inc.*, 2020 WL 2029621, at *71. They argue they are entitled to interest payments on the amount the Business Court assessed to be fair value accruing until the Business Court entered its final judgment, even if this Court affirms the Business Court's judgment that RAI initially paid fair value for the dissenters' shares.

¶ 68        In support of their argument, the dissenters point to N.C.G.S. § 55-13-30(e) (2019), which provides in relevant part that "[e]ach shareholder made a party to the proceeding is entitled to judgment . . . for the amount, if any, by which the court finds the fair value of the shareholder's shares, plus interest, exceeds the amount paid by the corporation to the shareholder for the shareholder's shares." Although this text could be read to support the dissenters' position, this language is not "clear and without ambiguity." *Diaz v. Div. of Soc. Servs.*, 360 N.C. 384, 387 (2006). What is clear from the text of N.C.G.S. § 55-13-30(e) is that a corporation must pay interest to shareholders who seek judicial appraisal. But the text does not definitely establish

how interest should be calculated. Because the language is "ambiguous or susceptible to multiple meanings, we turn to the other sources to identify the General Assembly's intent." *N.C. Farm Bureau Mut. Ins. Co., Inc. v. Lunsford*, 378 N.C. 181, 2021-NCSC-83, ¶ 20.

¶ 69 Reading this statutory language in context, we agree with the Business Court that the dissenters' proposed interpretation of the statute would produce "a nonsensical result, one supported neither by the text of the statute nor the intent of the legislature." *Reynolds Am. Inc.*, 2020 WL 2029621, at *71. Another provision of the appraisal statutes defines interest as accruing "from the effective date of the corporate action until the date of payment, at the rate of interest on judgments in this State on the effective date of the corporate action." N.C.G.S. § 55-13-01(6). It is reasonable to presume that the legislature intended its definition of "interest" in N.C.G.S. § 55-13-01(6) to be incorporated into another provision of the appraisal statutes where the term is otherwise undefined. *See Pelham Realty Corp. v. Bd. of Transp.*, 303 N.C. 424, 434 (1981) ("It is within the power of the legislature to define a word used in a statute, and that statutory definition controls the interpretation of that statute." (citation omitted)).

¶ 70 Additionally, the obvious intent of the appraisal statutes is to ensure that every shareholder has an opportunity "to obtain payment of the fair value of that shareholder's shares" in circumstances where the General Assembly believes the

nature of and circumstances attendant to a transaction risks depriving certain shareholders of fair value. N.C.G.S. § 55-13-02(a). The intent is to ensure that shareholders are made whole, not to give sophisticated entities another incentive to pursue "appraisal arbitrage." *In re Appraisal of Dell Inc.*, No. 9322-VCL, 2015 WL 4313206, at *23 (Del. Ch. July 13, 2015); *see also* Booth at 156 ("[I]t is important that appraisal not be used as a way for holdout stockholders to second-guess the will of the rest of the minority stockholders."). Given this clear intent, the result of the dissenters' interpretation—which would require RAI to pay the dissenters more than $100 million in interest payments, even though it has been established that RAI initially paid the dissenters fair value—is absurd. *See Person v. Garrett*, 280 N.C. 163, 166 (1971) ("The language of the statute will be interpreted to avoid absurd consequences."). Accordingly, we reject the dissenters' proposed construction of these provisions.

## V.   Conclusion

"The task of placing a value after the fact on shares of stock previously exchanged involves inexact approximations and a great deal of imprecision." *Cont'l Water Co. v. United States*, No. 125-78, 1982 WL 11255, at *6 (Ct. Cl. 1982) (per curiam). The fair value of a corporation cannot be determined by mathematical proof. Instead, "[e]stimations, predictions, and inferences based on professional judgment and experience are key ingredients in any valuation." *Brown v. Brewer*, No. CV06-

3731-GHK SHX, 2010 WL 2472182, at *27 (C.D. Cal. June 17, 2010) (unpublished).

¶ 72 In this case, the Business Court was presented with two radically different estimations of the fair value of shares of RAI held by a group of dissenting shareholders. To resolve this dispute, the Business Court utilized various "customary and current valuation concepts and techniques" to determine the fair value of the dissenters' shares, as was required under N.C.G.S. § 55-13-01(5). That there may exist some evidence in the record which detracts from the Business Court's ultimate determination of the fair value of the dissenters' shares is no cause to disturb its judgment. Instead, we agree with RAI that the Business Court determined the fair value of RAI shares in a manner which comported with the guidelines set forth in North Carolina's appraisal statutes. Accordingly, we affirm the Business Court's judgment in which it concluded that the dissenters were paid fair value for their shares.

AFFIRMED.